UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LANA PEREZ and ELENA LEFFLER   )        CASE NO. 07-21794
                                   )        MOORE/GARBER
      Plaintiffs,          )
                                   )
v.                                )
                                 )
SAKS FIFTH AVENUE, INC.,       )
a foreign profit corporation doing   )
business in Florida,         )
                                 )
      Defendant.         )
_____ /

## PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS IN DISPUTE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiffs, ELENA LEFFLER ("LEFFLER") and LANA PEREZ ("PEREZ") pursuant to Fed.R.Civ.P. 56, S.D. L.R. 7.1 and 7.5, submits this Concise Statement of Material Facts in Dispute to Which It is Contended There Exists Genuine Issues to Be Tried in Opposition to Defendant, SAKS FIFTH AVENUE, INC.,'s. ("SAKS") Motion for Summary Judgment as follows:

1.      The fact that SAKS is a well-known high-end department store with retail locations throughout the United States is not a fact that is material to summary judgment.

2.      PEREZ began her employment at SAKS Bal Harbour store in 1988 and was employed there for eighteen (18) years Perez Dep. at 75 lines 10-11; 79, line 4. She was born May 25, 1951 and was 54 years old when she was terminated in 2006. *Plt. Second Amended Complaint* at ¶¶13, 15, and 16; *Perez Dep.* at 8, line 8.

3.      LEFFLER became employed at SAKS in 1992 at the Bal Harbour store. *Plt. Second Amended Complaint* at ¶54; *Leffler Dep.* at 47, lines 1-3. LEFFLER was

---

[1]      The Court granted both Defendant's and Plaintiffs' page limit extensions for summary judgment [DE 48] and [DE 51].  Although Defendant requested to submit two separate statements of fact of 10 pages each, one pertaining to PEREZ, and the other to LEFFLER, Defendant combined its statement of facts. Pursuant to the amendment to S.D. L.R. 7.5, the Plaintiffs' Statement of Facts responds to and corresponds with the Defendant's paragraph numbering of its' Statement of Material Undisputed Facts.

1

around 47 or 48 years of age when she became employed at SAKS. *Leffler Dep.* at 47, lines 6-10. At the time of her termination she was 58 years of age. *Plt. Second Amended Complaint* at ¶51. Gloria Salerno ("Salerno"), who is currently 32 years old, became the Director of Human Resources at SAKS Bal Harbour store in July 2005 when she was 29 years old. *Salerno Dep.* at 96, lines 17-18; 18, lines 4-6; and 20, lines 3-5.

4.    LEFFLER and PEREZ received a copy of SAKS anti-discrimination policy in 1999, which invites the employee to confront the person responsible or notify Human Resources. *Plaintiffs Ex. 1.* Once a supervisor is aware of a discrimination complaint, the supervisor is required to investigate the allegations or report them to Human Resources. *Id.* Neither Salerno[2] nor Raymond Terbecki ("Terbecki"),[3] who in March of 2005 became the manager of the Contemporary Department and their direct supervisor, investigated or reported the age discrimination complaints of PEREZ and LEFFLER to any other Human Resource official although PEREZ and LEFFLER confronted Terbecki and Salerno directly that there were allegations of age discrimination.[4] *Perez Dep.* at 144-46; *Salerno Dep.* at 20, lines 17-20; *Leffler Dep.* at 64, lines 19-25; 65, lines 1-7; 88, lines 10-14; 128, lines 6-8; 129, lines 3-7; 118, lines 21-23; *Plaintiff's Ex. 3.*

5.    Salerno suspended PEREZ and LEFFLER on April 3, 2006. *Hanno Dep.* at 78, lines 18-25; Salerno Dep. at 48, lines 7-15; *Leffler Dep.* at 346-47, lines 24-1; *Perez Dep.* at 227-28. Salerno told Perez and Leffler that they were terminated. *Leffler Dep.* 222-23; *Perez Dep.* at 228; *Sugrue Dep.* at 50, lines 17-25; 51, lines 1-5.

6.    SAKS sales policy changed in and about May and June 2005 when SAKS trained managers and sales associates as part of huge changes in merchandising and customer service that the company was going through at the time.[5] *Plt. Ex. 4*; *Calderon*

---

[2]    Salerno had never conducted an age discrimination investigation. Salerno Dep. at 19, lines 20-23.

[3]    Terbecki was 42 years old at the time Plaintiffs were terminated. *See Plaintiff's Ex. 2*, Composite ages and hire dates. All employee lists used herein are authenticated by Declaration of Jim Hallowell.

[4]    LEFFLER and PEREZ complained to Curtis-Horvitz, another supervisor who also did not initiate an investigation of their complaints of age discrimination. *Leffler Dep.* at 71, lines 19-22; 107, lines 21-24; 136, lines 2-5; *Curtis-Horvitz Dep.* at 142, lines 12-19; *Plt. Ex. 3.*

[5]    It should be noted despite numerous deponents' testimony that there were handouts, notebooks, power point presentations regarding this training in management's training classes; Defendant has never produced any such documents to Plaintiffs. *See Slack Dep.* at 50, lines 15-16; *Slack Dep.* at 50-51, lines 22-3; *Calderon Dep.* at 83, lines 15-25.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

*Dep.* at 60-61, lines 20-2; *Calderon Dep.* at 42, lines 4-12.   The changes were revolutionary corporate changes implemented by the new CEO, Fred Wilson to better SAKS performance with its competitors.   *Calderon Dep.* at 42, lines 4-12.  First, upper management from the Bal Harbour store attend a meeting in New York, which included Deborah Slack ("Slack"), Vice President and General Manager[6] and Mindy Curtis-Horvitz ("Curtis-Horvitz"), who was the Assistant General Manager of Merchandising.[7] *Calderon Dep.* at 61, lines 6-9. LEFFLER and PEREZ attended one of the meetings. Perez Dep. at 201-02.   *Leffler Dep.* at 177-178, lines 17-15.  Every manager at the store, including asset protection, went through this training on the new vision for the company.   *Sugrue Dep.* at 37, lines 14-25; *Calderon Dep.* at 105, lines 23-25.  Terbecki and Salerno also took the "empowerment" and training program.  *Calderon Dep.* at 109, lines 21-25; *Calderon Dep.* at 110, lines 1-2; *Salerno Dep.* at 54, lines 14-22; *Salerno Dep.* at 56, lines 19-21.   Sales associates were similarly tapped on the head with a wand in the training meetings by Slack. *Sugrue Dep.* at 38, lines 1-10; *Calderon Dep.* at 75, lines 16-21; *Adelsohn Dep.* at 6, lines 16-22.   *See also Plt. Ex.* 5, 6, 7 and 8, Statements of Calderon, Edward Brando Villar, Fortun, and PEREZ The purpose of the training was to allow associates to be "empowered" to make decisions on certain factors without having to get sales managers' approval, for example, giving a discount for a pair of jeans that had a mark on them.  *Calderon Dep.* at 63, lines 18-25; *Salerno Dep.* at 55, lines 8-12; *Salerno Dep.* at 56-57, lines 22-2.   *See also Plaintiff's Ex.* 5, 6, 7 and 8. Prior to the new empowerment training, associates were to consult with a manager before giving discounts; however, after the training associates were empowered to take care of the customer.  *Calderon Dep.* at 39, lines 1-11.  Since managers were always busy, customers were kept waiting under the prior system, but the training was a solution to the problem.  *Calderon Dep.* at 42, lines 16-25.  Associates were now trained to use their own judgment without manager approval to empower the associates and to make the customers happy.   *Calderon Dep.* at 43, lines 1-14. Even before the empowerment training associates gave discounts, and if management approval was required, the policy was not being enforced at the Bal Harbour location at all. *Calderon*

---

[6]     For Slack's title see *Slack Dep.* at 21, lines 8-13.
[7]     *Curtis-Horvitz Dep.* at 15 lines 5-10.

*Dep.* at 74, lines 7-25; 75 at lines 1-2.  Associates would at times tell the manager after the fact. *Calderon Dep.* at 74, lines 19-23. After the training, associates could give customer discounts, take returns and make other decisions without manager approval. *Calderon Dep.* at 46, lines 11-15.  Associates were empowered to give a discount for several reasons, whether a garment was damaged or meeting prices with Bloomingdales or Neimans or for new accounts.  *Calderon Dep.* at 38, lines 19-25. Associates were allowed to give 10% discounts to customers who opened new accounts that were not yet approved; to match prices with competitors; to give 10% discounts for foreign customers who opened new accounts; and to give 10% discounts on damaged merchandise. *Calderon Dep.* at 47, lines 1-25; 48, lines 1-17; 50, lines 6-19; 73, lines 4-23.  None of the Contemporary Department sales associates were requiring customers to produce a receipt in order to effectuate a return.  *See Plt. Composite Ex. 9.*  The price that is in the register computer at the time of return is the price that the return even if the customer does not have a receipt and did not pay that price.  *Calderon Dep.* at 69, lines 7-16; *Ta Dep.* at 140, lines 9-22.

7.     SAKS investigation of the Plaintiffs' sales activities was not independent or kept confidential.  In and about March 16, 2006, Terbecki informed Salerno that Cherlie Jacques ("Jacques"), a substantially younger associate,[8] had complained that LEFFLER interfered with her customer and gave Terbecki the sales slip from the cash transaction showing a 10% discount.  *Plaintiff's Ex. 10.* The same day Salerno advised Margaret Phelan, Regional Director of Human Resources that Terbecki and she were in the process of researching LEFFLER's alleged "unauthorized" discounts. *Plt. Ex. 11.*  As of March 21, 2006, Salerno continued to communicate with Phelan concerning LEFFLER's discounts.  *See Plt. Ex. 12.* Salerno continued to feed information to, and advised Phelan about the investigation of PEREZ and LEFFLER, and she also kept Slack informed.  *See Plaintiff's Ex. 13.*[9]

8.     Although in and about December 2005, Jennifer Hanno ("Hanno"), Asset Protection Manager for SAKS Bal Harbour store, testified that she received a tip about

---

[8]     *See Plaintiff's Ex. 37,* Jacques DOB is July 1979.
[9]     Neither *Plt. Ex. 12* nor *Plt. Ex. 13* were ever produced by SAKS until after SAKS was required to comply with Magistrate Judge Garber's June 28, 2008 Order requiring the review tool to search emails be implemented for the electronic discovery.  Thus, neither document was available at the time depositions were taken by Plaintiffs.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

LEFFLER from Christine Ta ("Ta"), another Contemporary sales associate, and a tip from someone she does not remember about PEREZ that led her to conduct an investigation of their sales discounts; however, the investigation was closed on January 23, 2006, because there was no activity or "anything substantial to go on." *See Hanno Dep.* at 60, lines 19-25; 61, lines 1-9; 60, lines 10-13; *Plt. Ex.* 14. The "tip" Hanno received from Ta was a hearsay statement from Ta's selling partner Ingrid Stewart ("Stewart"), stating that a customer came in requesting soap and candles allegedly promised by LEFFLER and PEREZ. *Ta Dep.* at 44, lines 2-25; 45, lines 13-18; 46, lines 7-13; 47, lines 6-9; and 66, lines 20-22. It had nothing to do with unauthorized discounts or giving away merchandise. *Id.* Ta was also compensated for making the tip. *Ta Dep.* at 82, lines 20-25; 83, lines 1-13. She made a similar complaint to Hanno about Jacques in 2007 alleging that there was stuff lying by the desk and "hidden" somewhere by the desk. *Ta Dep.* at 95, lines 1-25; 103, lines 1-8.

9.    Hanno testified that she did not remember what prompted her to investigate PEREZ. *See Hanno Dep.* at 60, lines 19-25; 61, lines 1-9; 60, lines 10-13. Alex Friexa ("Friexa"), a second asset protection employee, stated that "reports" showing excessive 10% discounts prompted the investigation of LEFFLER and PEREZ; however, **all** Contemporary Associates were giving 10% discounts. *Friexa Dep.* at 46. *See also, Plt. Ex.*, *15, 16, 17, 18,19, 20, 21, 22,23, 24, and 25,* line discount reports 2006.[10]   In fact, Salerno prompted the investigation herself after Terbecki made her aware that Jacques gave him a receipt that revealed LEFFLER had given a 10% discount. *See Plt. Ex.* 10 and 11. The implication that sales teams had to be "authorized" is disputed because sales teams were commonplace in the Contemporary Department and Phelan had knowledge of them and had taken place for years at the Bal Harbour store. *See Plt. Ex. 26,* January 2005 Newsletter received by Phelan in which Ta and another sales associate, Robin Tawil ("Tawil") were commended for making $18,000 in team sales to fashion model, Nikki Taylor. Ta split commissions with both Tawil and another sales associate, Ingrid Stewart ("Stewart"). *Ta Dep.* at 45, lines 1-8; 191, lines 9-11 and 18-23; 166, lines 6-8. Hanno was aware that associates split

---

[10]    2006 overrides from electronic journals and line discounts are authenticated by the Affidavits of Jerry Kirby, Jesus Pena that are submitted as exhibits to Plaintiffs' opposition. The letters "MD" on receipts means markdown manually done at the register. *Friexa Dep.* at 50.

sales commissions even if she was not aware which associates were specifically working together. *Hanno Dep.* at 124-125.

10.    All Contemporary sales associates during the same time period gave discounts from 10% to 50% and greater. *Plt. Ex. 15 through 25.* Although Hanno claims she took from three to five months to investigate the Plaintiffs, Algarin's investigation took only two weeks. *Hanno Dep.* at 63-64; 219-220.

11.    Associates were empowered to give a discount for several reasons, whether a garment was damaged or meeting prices with Bloomingdales or Neimans or for new accounts. *Calderon Dep.* at 38, lines 19-25. All the sales associates throughout the store, including the Contemporary Department, were giving large discounts. *Adelsohn Dep.* at 20, lines 12-23; 71, lines 17-24. Adelsohn testified that to meet prices, she would sell a $2,500 handbag for $1,800. *Adelson Dep.* at 19, lines 1-18. No policies about authorized discounts were ever put in writing and the sales associate was authorized to use discretion in giving discounts. *Sugrue Dep.* at 33, lines 7-24; *Calderon Dep.* at 46, lines 4-11; *Calderon Dep.* at 44, lines 9-17; *Calderon Dep.* at 95, lines 6-9; *Adelsohn Dep.* at 39, lines 12-25. SAKS' policy simply says an associate could be terminated for "unauthorized" discounts, which in light of the training and practices of the store is undefined. *Plt. Ex. 27.*

12.    Many of the Contemporary Department sales associates and others were not requiring customers to produce a receipt in order to effectuate a return. *See Plt. Composite Ex. 9.* The price that is in the register computer at the time of return is the price that was given for the return even if the customer does not have a receipt and did not pay that price.[11] *Calderon Dep.* at 69, lines 7-16; *Ta Dep.* at 140, lines 9-22. *See also Plt.* Ex. 51 at pp. 3, 17-20, $240 refunded, item cost $144; Plaintiffs' Ex. 53 at p.4, $1395 marked down $837; *Plt. Ex. 54* at p. 1, $195, $145 and $280 refunded, items cost $77.90, $86.90 and $182.90 respectively; *Plaintiffs Ex. 59* at p. 2, $101, item $59.90; *Plt. Ex. 60* at p. 5, marked down $350, item cost unknown; and *Plt. Ex. 61* at pp. 7-9, refunded $100.80, item cost $66.90 and refunded $156, item cost $77.90.

13.    All Contemporary sales associates were routinely giving 10% discounts in

---

[11]    Hanno's investigation notes reveal that LEFFLER stated it was "very unusual" that the refunds were more than customer paid. Defendant's Ex. D1, Phelan Ex. 5. This is because refunds are based on the register price at the time.

circumstances where there was no credit card opened. *Plaintiffs Ex. 15 through 25.* In fact, Asset Protection was aware that other associates, including those substantially younger than Plaintiffs were giving 10% discounts alleged to be "unauthorized." *Friexa Dep.* at 89, lines 1-4. Associates were allowed to give10% discounts to customers who opened new accounts that were not yet approved; to match prices with competitors; to give 10% discounts for foreign customers who opened new accounts; and to give 10% discounts on damaged merchandise. *Calderon Dep.* at 47, lines 1-25; 48, lines 1-17; 50, lines 6-19; 73, lines 4-23.

14.    Although Hanno claimed to have investigated other associates in the Contemporary Department, she never did any printouts of their sales receipts in comparison to LEFFLER and PEREZ. *Hanno Dep.* at 71, lines 14-17. Sales receipts of other associates in the Contemporary Department for the same time period show associates other than PEREZ and LEFFLER giving 10% discounts, which Hanno admitted she would not know whether the discounts were authorized without further processing. *Hanno Dep.* at 203, lines 1-19. Despite Friexa's testimony that the perusal of other associates sales only showed they were "taking advantage of the 10%," younger associates in the Contemporary Department and storewide had given unexplainable 10% discounts in January, February, March and April 2006 and discounts that exceeded 10%; however, Hanno did not process those further. *Slack Dep.* at 74, lines 7-18; *Friexa Dep.* at 89, lines 1-4. *See Plt. Ex. 15 through 25,* line discount reports for 2006. For example, Jacques[12] gave numerous 40% discounts in January 2006 and on February 3, March 31, April 6, April 8 and April 9. *See Plt. Ex. 15* at pp. 31, 38-42. Archline Garcon ("Garcon") gave numerous 25%, 30% and 40% discounts in January 2006 and 40% discounts on February 4, 2006 and on April 6, 2006. *See Plt. Ex. 17* at pp. 17. 18, 19, 22-23, 25, 28, 42, 43, 44, and 46. Kathleen Shu ("Shu") line discount report for the same period reveals the same, including a discount on February 7, 2006 of over $200.00. *See Plt. Ex. 21,* generally and at p. 6. Marlene Charles ("Charles") also on March 4, 2006 gave several 28% discounts and 40% or more in February and March 2006. *See Plt. Ex. 23* at pp. 13, 24, and 31-32. Bernadette Bernard ("Bernard"),

---

[12]    Jacques, after being employed over a year and a half, was also disciplined for working off the clock in December 2006, a policy violation similar to Algarin; however, despite her egregious disciplinary record described herein, she remains employed by SAKS. *See Plt. Ex. 28.*

a fourth younger associate's sales for the same period show similar discounts in February and March 2006.  *See Plt. Ex. 24* at pp. 4, 5, 10, 17, 18, 22, 26, 37, and 39. Although Hanno claims Algarin's "unauthorized discounts" were discovered later, his line discount reports if reviewed as Hanno testified reveal similar large discounts for February, March and April 2006.[13]  *See Plt. Ex. 16.*

15.     Plaintiffs believed that they were empowered to give discounts rather than using them as a selling tool. Quite the opposite, PEREZ denied any wrongdoing to Hanno.  *Perez Dep.* at 227.  Hanno's statement to the contrary is disingenuous.  *Id.* at 230-31.  LEFFLER told Hanno that she was meeting the prices or giving 10% on foreign accounts.  *Leffler Dep.* at 303-304.  In fact, LEFFLER testified that Hanno inferring that discounts were given, as a selling tool, was a "complete lie."  *Leffler Dep.* at 309, lines 3-9.

16.     If the customer did not have a receipt, the Plaintiffs' had no choice but to trust the customer because the register gave them the amount of the refund.  Other Contemporary Department sales associates were not requiring customers to produce a receipt in order to effectuate a return.  *See Plt. Composite Ex. 9.*  The price that is in the register computer at the time of return is the price that the return even if the customer does not have a receipt and did not pay that price.  *Calderon Dep.* at 69, lines 7-16; *Ta Dep.* at 140, lines 9-22. Stewart had returned merchandise without a receipt before and credited the customer the full price.  *See Ta Dep.* at 139, *Ta Dep.* Exhibit 4 at p. 33.   On December 27, 2005, in the period LEFFLER and PEREZ were investigated, Algarin returned more money than the customer paid where he gave a credit of $285 for the item being returned without a receipt when the customer appears to have paid $170.90. *Plaintiff's Ex. 50.*

17.     To the contrary, PEREZ never offered to repay as she did not do anything wrong to her understanding.  *Perez Dep.* at 305.  LEFFLER denied that she did any thing wrong and did not agree to sign a promissory note to repay SAKS, but Hanno forced her to sign it and she did so without even reading it.  *Leffler Dep.* at 346-47.  In

---

[13]     Slack testified that the only months that the only other discounts that are typically allowed are "Friends and Family" discounts that occur in October and April, thus the other associates discounts in January, February and March 2006 should have been equally suspicious.  *Slack Dep.* at 34, lines 4-12;35, lines 7-10.

fact, Hanno would not even give her a copy of the promissory note that she signed.  *Id.* at 348, lines 2-7.

18.     There is a material dispute as to how Phelan first learned of the investigation and from whom she received her information about LEFFLER and PEREZ. The same day Salerno advised Margaret Phelan, Regional Director of Human Resources that Terbecki and she were in the process of researching LEFFLER's alleged "unauthorized" discounts. *Plt. Ex. 11.*  As of March 21, 2006, Salerno continued to communicate with Phelan concerning LEFFLER's discounts.  *See Plt. Ex. 12, e-mail exchange dated March 21 between Salerno and Phelan.*  Salerno continued to feed information to and to advise Phelan about the investigation of PEREZ and LEFFLER and she also kept Slack informed via copying her on the e-mail.  *See Plaintiff's Ex. 13,* March 25 e-mail to Phelan copied to Slack.

19.     Contrary to the policy of confidentiality alleged by Defendant, Hanno was in communication with Salerno.  *Plt. Ex. 11 and 13.* There is no evidence that Phelan reviewed anything independent of what she was told. *Phelan Dep.* at 92, lines 9-24; 92-3, lines 25-7.  She received all information from Salerno, including the report showing discounts of LEFFLER and PEREZ that Salerno forwarded directly to Phelan.  *See Plt. Ex. 13.*

20.     It is not disputed that Phelan told Salerno to terminate the PEREZ and LEFFLER; however, any implication drawn that Phelan made the decisions independent of Salerno's input is disputed.  *See Plt. Ex.' 10, 11, 12,* and *13.*

21.     It is disputed that Salerno had input with regard to the terminations of PEREZ and LEFFLER.  *Id.*  Salerno requested a conference with Phelan on March 21, 2006.  *See Plt. Ex. 12.*

22.     Although Phelan was 57 at the time, she did not make the decision without input from Salerno and Terbecki, who were significantly younger than LEFFLER and PEREZ.  Both Terbecki and Salerno were aware that Plaintiff's had made age discrimination complaints because of Terbecki referring to them as "old" and "mature." *See  Plaintiff's  Ex. 3.*[14]  The blanket statement that Phelan terminated younger

---

[14]     It should further be noted that Defendant did not produce this document until June 5, 2008 well after all depositions had concluded and not until Magistrate Judge Garber compelled SAKS to provide

employees for conduct uncovered in Asset Protection investigations is not material as there are no circumstances revealed that would show whether the individuals were similarly situated to LEFFLER and PEREZ, particularly where none of them were sales associates at the Bal Harbour store and no comparative data by age of all the employees Phelan terminated to determine whether her decisions were equally distributed to those under 40 years of age and over 40 years of age. *See Plt. Ex. 37.*

23.     There is no dispute that Algarin, age 30, was employed for six months, worked off the clock or that he was investigated.

24.     There is no dispute that Algarin over refunded at least one time during the period he was investigation; however, he over refunded at least one additional time in December 2005 which was inclusive of the period LEFFLER and PEREZ were investigated.  *Plt. Ex. 50.*  Nonetheless, the LEFFLER and PEREZ investigation spanned a six-month period from November 2005 until April 2006.  *See Defendant's Ex. D, Phelan Dep. Ex. 9 and 14.*

25.     Algarin's statement in no way indicates that he forgot to clock out or that his conduct was inadvertent.  Instead, his signed statement, which speaks for itself, states in relevant part, "I thought that it was okay to ring this way I knew I was making sales but not counting on the hours."  *Plt. Ex. 29.*  Algarin believed as did PEREZ and LEFFLER that they were empowered to give discounts even where the card was denied.

26.     Despite Phelan's self-serving explanation, she did not conduct any independent investigation and simply relied on information that was communicated to her.  *Phelan Dep.* at 38, lines 2-4.  What she fails to include in her affidavit and what she testified she could not remember at her deposition is that Salerno had advised her that LEFFLER and PEREZ were allegedly making unauthorized discounts several weeks prior to early April 2006.  *Phelan Dep.* at 38, lines 5-10; Plaintiffs' *Ex. 11, 12 and 13.*  Phelan could not have relied on the number of discounts made by either Algarin or Plaintiffs because Phelan never reviewed the detail of the number of unauthorized discounts. *Phelan Dep.* at 92, lines 9-24; 92-3, lines 25-7.

---

electronic discovery including e-mail.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

27.     Algarin had signed an Acknowledgement and Receipt of the Associate Handbook and was aware that "unauthorized" discounts were punishable infractions. *Plt. Ex. 30.*   Algarin had been disciplined previously for Credit Card Acceptance Violations on March 2, 2006.  *Plt. Ex. 31.*   Algarin was not confused at all as he stated to Asset Protection that "wow that's wrong, very wrong." *Plt. Ex. 32.*

28.     Phelan's understanding was based on information she received from Salerno who did not inform her that PEREZ had made previous allegations that Jacques was threatening her.  *Phelan Dep.* at 162, lines 13-21.  Salerno did not inform her of that PEREZ and LEFFLER had prior issues working with Jacques.  *Id.* at 163, lines 6-20.  This was the first incident of alleged unauthorized discounts for all three individuals and Phelan was aware of that fact.  *Phelan Dep.* at 27, lines 9-17; 116, lines 11-19. Despite the fact that SAKS generally administered progressive discipline, none was afforded to PEREZ or LEFFLER.  *Calderon Dep.* at 14-16*; Phelan Dep.* at 29, line 10; 53.

29.     Phelan could not have relied on the number of discounts made by either Algarin or Plaintiffs because Phelan never reviewed the detail of the number of unauthorized discounts. *Phelan Dep.* at 92, lines 9-24; 92-3, lines 25-7.

30.     Number of returns and discounts is not material because Phelan never reviewed the number of returns or discounts in making the decision.  *Id.*

31.     The statement that Algarin never gave more than 10% discount is disingenuous. Algarin's overrides indicate discounts of 40% and 25% and the line discounts reports show he gave discounts whether authorized or unauthorized ranging from 10% to over 89% for the period of January through April 2006, the relevant and part of same period PEREZ and LEFFLER were investigated.[15] *Plt. Ex. 16; Plt. Ex. 33.* Algarin's investigation report indicates discounts exceeding 40%.  *See Plaintiff's Ex. 34.* Whether Plaintiffs' are not similarly situated to Algarin is a legal conclusion not a statement of fact and must be stricken.

32.     Whether Plaintiffs' conduct is nearly identical to Algarin's conduct is a legal conclusion not a statement of fact and must be stricken. Nonetheless, neither LEFFLER nor PEREZ in their respective 14 and 18 years of employment had ever been

disciplined for giving unauthorized discounts in the past. *Phelan Dep.* at 116, lines 11-19. SAKS admitted that the conduct is the same despite Phelan's self-serving affidavit. *Hanno Dep.* at 158, lines 18-20.

33. Neither before, nor after the empowerment training, were any of the policies in issue about customer discounts put in writing and provided to associates. *Sugrue Dep.* at 33, lines 7-24; *Calderon Dep.* at 46, lines 4-11; *Calderon Dep.* at 44, lines 9-17; *Calderon Dep.* at 95, lines 6-9. At the training, associates were simply told to use their best judgment. *Calderon De*p. at 95, lines 10-13. Although the Associate Handbook effective at the relevant time indicated at page 46 number 6 that associates could not "provide any unauthorized rate or discount for merchandise," nothing defined in writing what was considered "unauthorized*." See Plaintiff's Ex.* 27; *Sugrue Dep.* at 33, lines 7-24; *Calderon Dep.* at 46, lines 4-11; *Calderon Dep.* at 44, lines 9-17; *Calderon Dep.* at 95, lines 6-9. Slack stated the handbook is the only document that discusses associate discounts. Slack Dep. at 44, lines 15-19.

34. Not only Algarin believed he was allowed to give such discounts. Both PEREZ and LEFFLER thought they were empowered to give discounts in their discretion and did not intentionally give discounts as SAKS claims nor did they admit discounts were intentionally given to customers. *Leffler Dep.* at 303-304; *Perez Dep.* at 213-14; 216. *See Defendant's Ex. F*, [DE 84-11], statements of PEREZ dated April 2, 2006 and LEFFLER statement taken by Hanno dated April 3, 2006. *See also, Plt. Ex. 8.*

35. Contrary to Hanno's implication in her report that PEREZ and LEFFLER used discounts as a selling tool, PEREZ testified that she explained to Hanno that she believed she was allowed to give the discounts Hanno alleged were wrongly given. *Perez Dep.* at 226. Quite the opposite, PEREZ denied any wrongdoing to Hanno. *Id.* at 227. Hanno's statement to the contrary is disingenuous. *Id.* at 230-31. LEFFLER told Hanno that she was meeting the prices or giving 10% on foreign accounts. *Leffler Dep.* at 303-304. In fact, LEFFLER testified that Hanno inferring that discounts were given as a selling tool was a "complete lie." *Leffler Dep.* at 309, lines 3-9. LEFFLER requested to see the register or computer to see her transactions, but Hanno refused telling her it was private information. *Leffler Dep.* at 310, lines 17-22.

36.     PEREZ denies any intentional over refunding to customers. *Perez Dep.* 213-14.  She testified that Terbecki approved three of the transactions, and the third transaction she believes she made a mistake.  *Id.* at 308.  Terbecki's signature was not required for discounts he approved.  *Friexa Dep.* at 41, lines 15-24 and 42, lines 1-3.

37.     LEFFFLER denies giving any intentional over refunding to customers. *Leffler Dep.* at 315-17.   Leffler stated to Hanno that she believed that there were mistakes and wanted to check them out.  *Id.* at 316, lines 1-5; 318, lines 1-22.

38.     Algarin may have over refunded only once during the time period that his sales were investigated from January through April 2006; however, the LEFFLER and PEREZ investigation spanned a six-month period from November 2005 until April 2006. *See Defendant's Ex. D, Phelan Dep. Ex. 9 and 14.*  Phelan never reviewed the detail of the number of unauthorized discounts for LEFFLER or PEREZ; and, thus, it is disputed that she considered the number of incidents in her decision-making. *Phelan Dep.* at 92, lines 9-24; 92-3, lines 25-7.

39.     It is disputed that Algarin was punished and given a final written warning. No such warning was produced by SAKS until the day before Phelan's deposition. Phelan testified at her deposition that the document itself was "created" two or three weeks prior to Phelan's deposition (i.e. almost two years after the incident), and in which she stated that SAKS could not find it so Phelan instructed the document to be "rewritten" and "rerecorded."  *Phelan Dep.* at 165-169; *Phelan Dep. Ex. 17.*  In fact, Terbecki, who allegedly disciplined Algarin for this conduct, replaced PEREZ with Algarin on April 22, 2006 relative to the responsibilities for the D&G line of clothing only three (3) days after his alleged disciplinary action.  *Phelan Dep.* at 169-70, lines 25-7; *Phelan Dep. Ex. 17*; *Plt. Ex. 35.*

40.     Whether SAKS has proffered a legitimate, non-discriminatory reason for terminating Plaintiffs and whether that reason was credible and in good faith are conclusions of law rather than a statement of fact and must be stricken.

41.     In and about March 16, 2006, and Terbecki informed Salerno that Jacques had complained that LEFFLER interfered with her customer and gave Terbecki the sales slip from the cash transaction showing a 10% discount.  *Plaintiff's Ex. 20.*  That same day Salerno forwarded the Terbecki e-mail and advised Phelan that Terbecki and

she are in the process of researching LEFFLER's alleged "unauthorized" discounts. *Plaintiff's Ex. 11.* As of March 21, 2006, Salerno continued to communicate with Phelan concerning LEFFLER's discounts. *See Plt. Ex. 12, e-mail exchange dated March 21 between Salerno and Phelan.* Salerno continued to feed information to and to advise Phelan about the investigation of PEREZ and LEFFLER.[16] *See Plaintiff's Ex. 13.*

42.     Salerno prompted the investigation herself after Terbecki made her aware that Jacques gave him a receipt that revealed LEFFLER had given a 10% discount. *See Plt. Ex. 10* and *11.*

43.     It is disputed that Phelan made the decision without input from Salerno and Terbecki.  As cited above, there is evidence of communications between Terbecki, Salerno and Phelan prior to PEREZ and LEFFLER being terminated, including a request by Salerno to discuss LEFFLER with Phelan.  *See Plt. Ex. 10, 11, 12,* and *13.*

44.     It is not disputed that Hanno did not know that PEREZ and LEFFLER had made prior age discrimination complaints, but she was prompted to do the investigation by Salerno and Terbecki who were aware of the prior age complaints, and whose hiring practice demonstrated that they were solely recruiting sales associates for the Bal Harbour store in the Contemporary Department well under forty (40) years of age. *See Plt. Ex. 3* and *Plt. Ex. 11.*

45.     It is not disputed that that PEREZ and LEFFLER made initial complaints of age discrimination in June and November 2005.

46.     The Performance Improvement warning alleging insubordination that PEREZ received from Terbecki on December 16, 2005 was after she complained of age discrimination in November 2005, and it was an act of retaliation, which speaks for itself. *Plaintff's Ex. 63.* Salerno advised Terbecki and was present when the Performance Improvement warning was presented to PEREZ, at which time she told PEREZ that if

---

[16]     Again, the Court should note that at least two of the documents that indicate Salerno's and Terbecki's knowledge of the investigation (that was supposed to be independently conducted by asset protection) and actually their involvement in the investigation in March, 2006, only became available to Plaintiffs after discovery closed on June 30, 2008; and after implementation of the e-discovery review tool after Defendant filed its Motion for Summary Judgment.  In January 2008, SAKS argued that because it had already produced "2,197 documents", it should be relieved of further production. Magistrate Judge Garber rejected that argument. *See* [DE 34]. At the same time, SAKS stated, incredibly, *"It is highly unlikely there even exist any documents responsive to this request."* [DE 32]. Even more egregious, Terbecki testified untruthfully in his deposition without hesitation that he had no knowledge of the investigation at the time it was taking place.  *Terbecki Dep.* at 38, lines 11-13.

she did not sign it, there was going to another paper in six months and another paper six months after that one. *Plaintiff's Ex. 64*; *Perez Dep.* 254-55.

47.     It is disputed that PEREZ had an attitude on the floor.  It was she who complained about Jacques threatening her on the floor.  *Perez Dep.* at 147, lines 22-25; 146, line 12-6. Jacques was the only employee disciplined.  *Salerno Dep.* at 42, lines 8-23.   Contrary to being treated in a fair manner, the meeting on December 10, 2005, Salerno told LEFFLER "not to cross her door ever again." *Leffler Dep.* at 116, lines 16-19; *Fortun Dep.* at 76, lines 9-11.  Terbecki told PEREZ that she had "no rights" in the building.  *Perez Dep.* at 189, lines 8-9.

48.     Immediately after PEREZ and LEFFLER were terminated, SAKS Asset Protection began training sales associates at the Bal Harbour store about the propriety of and when customer discounts could be given.  *Adelsohn Dep.* at 32, lines 18-25; 36, lines 8-22.  Sales associates were told that they needed management approval for 10% discounts.  *Id.* at 33, lines 7-15. Again, in May 2007, SAKS held training regarding 10% discounts when opening a SAKS charge.  *See Plt. Composite Ex. 36.*

49.     Prior to Terbecki being hired, LEFFLER did not have an assignment to a particular line of clothing to sell. *Leffler Dep.* at 61, lines 5-11.  After Terbecki was hired, Curtis-Horvitz determined that all sales associates must be assigned to a particular line of clothing.  *Leffler Dep.* at 61-62, lines 16-15.  However, LEFFLER did not receive her assignment until shortly before her termination.   *Leffler Dep.* at 62, lines 12-15. LEFFLER asked Terbecki approximately a week or two after he became her manager to be assigned to the Marc Jacob line of clothing.   *Leffler Dep.* at 62-63, lines 24-13. Terbecki told her he would get back to her, but instead he hired Jessica Alamo, who was substantially younger than LEFFLER,[17] for the Marc Jacob line.  *Leffler Dep.* at 64, lines 3-15.

50.     LEFFLER complained to Terbecki about the decision to give the Marc Jacob line to Alamo, but he gave her no reason for it.  *Leffler Dep.* at 64, lines 19-25; 65, lines 1-7.  LEFFLER continued to ask Terbecki to assign her to a line of clothing, in particular, Diane Von Furstenberg and Joia.  *Leffler Dep.* at 65, lines 11-18 and 67, lines

---

[17]     Alamo is misspelled as Alario, however, she was born in August 1981 according to SAKS 1047. *See Plt. Ex. 37*, Contemporary Associates from January 2005 to the time of the production.

15-25.  Terbecki, again assigned Joia in September 2005 to a substantially younger associate, Jacques.[18]  *Leffler Dep.* at 67-68, lines 25-4; *Plt. Ex. 37.*  Terbecki assigned Diane Von Furstenberg to Ta who is nine years younger than LEFFLER.  *Leffler Dep.* at 65, lines 19-22 *and Plaintiff's Ex. 2.*  Eventually, LEFFLER learned that she was assigned to the Catherine Malandrino line.  *Leffler Dep.* at 69, line 19-25 and 70, lines 1-10. The Catherine Malandrino line was a small line of clothing.  *Leffler Dep.* at 112, lines 4-7.

51.     LEFFLER complained to Curtis-Horvitz that Terbecki was assigning all of the lines to younger associates.  *Leffler Dep.* at 71, lines 19-22; 107, lines 21-24; 136, lines 2-5.  Chely Fortun ("Fortun"), another associate, who is 58 years old,[19] testified that she observed that the best lines were going to new younger associates.[20]  *Fortun Dep.* at 21, lines 9-16; 21, lines 17-25; 23, lines 11-25.   LEFFLER also asked Terbecki if he was not assigning her a line of clothing because of her age.  *Leffler Dep.* at 128, lines 6-8.  *See also, id.* at 129, lines 3-7. When she asked Terbecki if it was her age that prevented her from getting a line, he did not respond.  *Leffler Dep.* 136, lines 2-5; 175, lines 21-25.

52.     PEREZ also repeatedly asked Terbecki to assign her a line of clothing.  *Perez Dep.* at 126, 241-2 and 245. LEFFLER was not the only older associate that had issues with the line of clothing assigned after Terbecki became the manager of the Contemporary Department.  *Fortun Dep.* at 22, lines 10-20.  Fortun testified that it also took a long time for Terbecki to assign her to a line of clothing.  *Id.* at 23, lines 3-10.

53.     In and about June 2005, Terbecki made the decision to transfer LEFFLER to the "back room" of the Contemporary Department.  *Leffler Dep.* at 84, lines 8-11. LEFFLER considered this transfer a demotion.  *Leffler* Dep. at 82, lines 1-3. Approximately a week after the transfer, in and about June 2005, LEFFLER requested a meeting with Curtis-Horvitz and Terbecki to complain about the transfer, which she felt was on account of her age.  *Leffler Dep.* at 88, lines 10-14, *Plt. Ex. 39.*  Terbecki became angry and left the meeting.  *Leffler Dep.* at 90, lines 16-21; 92, lines 9-15. While

---

[18]     Jacques was 26 years old in 2005 when the decision was made by Terbecki.  *See Plaintiff's Ex. 37.*

[19]     *See Plaintiff's Ex. 37*, Fortun's date of birth is December 1949.

[20]     Fortun observed that Bernadette, who was in her late 20's was assigned Juicy.  *Fortun Dep.* at 25, lines 1-14.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BOCA RATON • FORT LAUDERDALE • MIAMI

there was no resolution of her complaint at this meeting, the following day LEFFLER received a memorandum stating that she was assigned to the front floor of the Contemporary Department. *Leffler Dep.* at 110-111, lines 16-1.

54.     LEFFLER also noticed that the associates Terbecki hired were substantially younger than her; and also, that the younger associates were being assigned to clothing lines versus older associates. *Leffler Dep.* at 117, lines 10-15. Fortun also noticed that Terbecki was hiring a lot of younger people. *Fortun Dep.* at 20, lines 2-12. Fortun testified that problems began in the Contemporary Department after Terbecki was hired. *Fortun Dep.* at 19-20, line 15-1.

55.     LEFFLER also witnessed a conversation between PEREZ and Terbecki in which Terbecki called her "old" and said that he was moving her to the back room. *Leffler Dep.* at 118, lines 2-25; 119, line 1.  *See also Leffler Dep.* at 120, lines 1-25. LEFFLER overheard PEREZ ask Terbecki if his moving her to the back room was age discrimination. *Leffler Dep.* at 118, lines 21-23.  LEFFLER, who was present, stated that is age discrimination. *Id.* at 118, lines 24-25; 119 line 1.  PEREZ complained to Curtis-Horvitz that Terbecki wanted to transfer her to the back room because she is "old." *Curtis-Horvitz Dep.* at 142, lines 12-19. Curtis- Horvitz brought Salerno into the meeting where PEREZ restated her complaint. *Perez Dep.* at 144-46. *See also, Plaintiff's Ex. 3*, E-mail dated November 12, 2005 that Terbecki sent to Salerno in which Terbecki admits telling PEREZ that "she could bring maturity to the backroom" and that PEREZ complained about that being age discrimination.[21]  Terbecki also told Fortun that she was "mature" and he needed a mature person in the back room.[22] *Fortun Dep.* at 44, lines 18-25; 45, lines 23-25; 46, line 1-20; 49, lines 1-3.  On or about January 29, 2006, Terbecki, attempted to transfer Stewart, who is 62 years old,[23] to the back room. *See Plaintiff's Ex. 40.* Terbecki punished PEREZ in giving her a "stupid line" and sending her to the back room according to Fortun. *Fortun Dep.* at 49, lines 4-14. Terbecki also threatened Fortun with false accusations that she was not getting along

---

[21]     Tebercki, again, perjured himself by unequivocally denying this in his deposition. *Terbecki Dep.* at 132, lines 8-13.

[22]     Fortun also testified that being sent to the back room was like punishment because it was unbearable to work with these very young people who were very disrespectful and aggressive towards the older employees. *Fortun Dep.* at 46, lines 21-25; 47, lines 1-10.  Fortun testified that she did not complain because she feared losing her job and she needed her job. *Fortun Dep.* at 50, lines 4-9.

[23]     *See Plaintiff's Ex. 37* for Stewart's date of birth.

with her younger co-workers.  Fortun Dep. 59, lines 15-24; 60, lines 4-15.

56.   In addition to complaining to Curtis-Horvitz and Terbecki, LEFFLER complained to Noel Sugrue ("Sugrue"), who was the Human Resources Assistant to Salerno, about Jacques harassing her and PEREZ, disrupting sales, being unprofessional and that she was given a good line of clothing, but Sugrue told her that she "had better stop complaining or she would end up on the Third Floor."   *Leffler Dep.* at 135, lines 1-12.  Sugrue made a similar statement to Fortun when Fortun told her that SAKS was hiring "all these new, young people" and Sugrue told her that they had to make room for the younger people and send all the "old people to the Third Floor." *Fortun Dep.* at 37, lines 9-14.  Vivian Adelsohn ("Adelsohn"), who was 68 years old at the time and a Bal Harbour sales associate on the Second Floor testified that Curtis-Horvitz told her she had to work on the Third Floor in the gift department during Salerno's tenure in human resources.  *Adelsohn Dep.* at 10-12; 15, lines 4-7.  Adelsohn quit in August 2006 because she could not make a living working on the Third Floor.  *Id.* at 8, lines 1-3; 12, lines 15-23.  The Third Floor was considered the "final resting place" for sales associates 55 to 60 years old.  *Id.* at 13, lines 6-11.  Adelsohn testified SAKS wanted to get rid of employees over 55. *Id.* at 23, lines 3-10.

57.   Prior to December 2005, Jacques had been harassing LEFFLER by deliberately removing clothes from the fitting rooms while LEFFLER was assisting customers and did the same thing with PEREZ and Fortun. *Leffler Dep.* at 141, lines 4-18; 142, lines 10-16; *Fortun Dep.* at 62, lines 5-18; 66, lines 9-17. Jaques shook the cash register and threatened Perez by stating "you don't know who you are messing with."  *Leffler Dep.* at 142, lines 21-25; *Fortun Dep* at 66-67, lines 19-1. In fact, on December 10, 2005, Salerno met with Terbecki, Jacques, LEFFLER, PEREZ and Fortun.  *Salerno Dep.* at 42, lines 8-23 ad 44, lines 5-10.  Initially, PEREZ was afraid to attend the meeting because of Jacques threat, but she did attend; however, Terbecki on advice of Salerno disciplined her for insubordination for her initial refusal to attend.  *Perez Dep.* 187-88, 191; *Plaintiff''s Ex. 63; Plaintiff's Ex. 64.*  Salerno stated that LEFFLER handled the matter "in a positive and fair manner."  *See Plaintiff's Ex. 41.*

58.   At the meeting on December 10, 2005, Salerno told LEFFLER "not to cross her door ever again." *Leffler Dep.* at 116, lines 16-19; *Fortun Dep.* at 76, lines 9-

11.  Fortun testified that PEREZ, LEFFLER and Jacques[24] and she were present in the meeting with Salerno who screamed at them and banged on the table and told them she never wanted to see them again in her office.[25] *Fortun Dep.* at 75, lines 22-25; 75, lines 1-25 and 76, lines 9-11.

59.     Salerno had the ultimate authority to hire associates.  *Sugrue Dep.* at 50, lines 8-16; *Salerno Dep.* at 24, lines 4-7; *Phelan Dep.* at 50, lines 20-25; *Sugrue Dep.* at 48, lines 10-22. Terbecki would interview and recommend candidates for associate positions. *Phelan Dep.* at 51, lines 20-25; *Sugrue Dep.* at 49, lines 1-10. At the relevant time period, Curtis-Horvitz was another manager involved in the hiring decisions. *Salerno Dep.* at 96, lines 4-15. Hendrickson and Lauren Massaro, age 25, were the first two Contemporary Department hires after PEREZ and LEFFLER were terminated. *Plt. Ex. 37* and *Plaintiff's Ex. 43.*  Two other associates, Nick Greene, age 25 and Gabriela Guzman, age 20, were also hired during that time period; however, they were terminated after Salerno's tenure. *See Plaintiff's Ex. 43.* No one over the age of 40 was hired for the Contemporary Department during the time that Salerno was the Director of Human Resources.[26]  *See Plaintiff's Ex. 43; Plaintiff's Ex. 44* and *Plaintiff's Ex. 37.* In fact, Slack communicated in November 2005 to Salerno that hiring "younger [sales associates] is a priority."  *See Plt. Ex. 45 and 46* (March 2006 memo to Salerno stating "only 67 year olds will stay" and requesting a younger man with muscles).

60.     From January 2005 to the present time, the Third Floor[27] of the SAKS Bal Harbour store consisted of a majority of twenty-three (23) employees over the age of 40 and ten (10) employees under age 40.  *See Plt. Ex. 47.*  During that same time period, nineteen (19) of the twenty-three (23) employees were 50 or more years old.  *Id.*

61.     On March 26, 2007, the U.S. Equal Employment Opportunity Commission ("EEOC") issued both LEFFLER and PEREZ a Letter of Determination in which the

---

[24]     Jacques name is misspelled in the deposition as "Shirley" rather than "Cherlie."

[25]     Jacques continued to fail in relationships with her co-workers, particularly the associates over 50 years old, after December 10, 2005 and a lack of professionalism for which she received numerous reprimands, but was not terminated.  *See Plt. Composite Ex. 42*; *Ta Dep.* at. 112, lines 15-25; 113, lines 1-7. Jacques is still employed to date and was promoted to a management position.  *Id.*

[26]     Department 24 refers to the Contemporary Department.  *Phelan Dep.* at 105, lines 9-19.

[27]     According to Calderon, who was a former sales manager of the Contemporary Department and designer sportswear during the relevant period from 2003 to 2005, the Third Floor was the "least desirable place to be an associate" because the associate would have to work magic to build her book of business.  *Calderon Dep.* at 7, lines 4-15; 103, lines 3-16.

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI

EEOC found "the evidence obtained during the investigation establishes that there is a reasonable cause to believe that Charging Party was discriminated against because of her age in violation of the ADEA." *Plt. Ex. 48*; *Plt. Ex. 49*.

Respectfully submitted,

DEUTSCH ROTBART & ASSOCIATES, P.A.
Counsel for Plaintiffs
7251 West Palmetto Park Road
Suite 206
Boca Raton, Florida 33433
Telephone:  561.361.8010
Facsimile:   561.361.8086

BY:   Erika Deutsch Rotbart s/.
          Erika Deutsch Rotbart, Esq.
          Florida Bar No.: 0047686

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **July 21, 2008**, the foregoing document was electronically filed with the Clerk of the court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in a manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

DEUTSCH ROTBART & ASSOCIATES, P.A.

BY:   Erika Deutsch Rotbart s/.
          Erika Deutsch Rotbart, Esq.
          Florida Bar No.: 0047686

## SERVICE LIST
*Lana Perez and Elena Leffler v. Saks Fifth Avenue, Inc.*
*CASE NO.: 07-21794-CIV-MOORE/SIMONTON*

Justin B. Uhlemann, Esq.
McDermott Will & Emery LLP
201 South Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
Telephone: 305.358.3500
Facsimile:   305.347.6500
E-mail: juhlemann@mwe.com

DEUTSCH ROTBART & ASSOCIATES, P.A.
B O C A   R A T O N   •   F O R T   L A U D E R D A L E   •   M I A M I

Joel E. Cohen (pro hac vice)
E-mail: jcohen@mwe.com
Katherine D. Kale (pro hac vice)
E-mail: kkale@mwe.com
340 Madison Avenue
New York, New York 10173-1922
Tel: 212.547.5400
Fax: 212.547.5444

Erika Deutsch Rotbart, Esq.
Deutsch Rotbart & Associates, P.A.
7251 West Palmetto Park Road
Suite 206
Boca Raton, FL 33433
Telephone:  561.361.8010
Facsimile:   561.361.8086
E-mail:  edrotbart@comcast.net

DEUTSCH ROTBART & ASSOCIATES, P.A.
BOCA RATON • FORT LAUDERDALE • MIAMI