**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 07-21794-CIV-MOORE/SIMONTON

LANA PEREZ and
ELENA LEFFLER,

      Plaintiffs,

vs.

SAKS FIFTH AVENUE, INC., a foreign
Corporation doing business in Florida,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

THIS CAUSE came before the Court upon Defendant's Motion for Judgment as a Matter of Law (dkt # 179).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I.   BACKGROUND

The facts of this case are set forth in this Court's Summary Judgment Order dated August 7, 2008 (dkt # 131).  Trial was held and the jury returned a verdict in favor of Plaintiff Lana Perez ("Perez") for $370,000 and in favor of Plaintiff Elena Leffler ("Leffler") for $240,000. Special Verdict Form (dkt # 171).

## II.   ANALYSIS

Defendant Saks Fifth Avenue, Inc. ("Saks") contends that judgment as a matter of law is warranted because Plaintiffs failed to prove that age was a substantial motivating factor in the decision to suspend and terminate Plaintiffs.  When ruling on a motion for judgment as a matter of law, a court must "consider all the evidence in the light most favorable to the non-moving

party, and independently determine whether the facts and inferences point so overwhelmingly in favor of the movant . . . that reasonable people could not arrive at a contrary verdict." <u>Webb-Edwards v. Orange County Sheriff's Office</u>, 525 F.3d 1013, 1029 (11th Cir. 2008) (quoting <u>Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.</u>, 162 F.3d 1290, 1308 (11th Cir. 1998)) (internal quotation marks and citation omitted). The court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for the [non-moving party]." <u>Telecom Technical Servs. Inc. v. Rolm Co.</u>, 388 F.3d 820, 830 (11th Cir. 2004).

The Parties agree that the decision to terminate Plaintiffs was made by Margaret Phelan ("Phelan"), the Regional Director of Human Resources for Saks, but disagree as to whether her decision was impermissibly influenced by the age based animus of others. Allegations that a neutral decision maker was influenced by the age animus of others, such that the decision maker becomes a mere conduit for the discriminatory bias of another, is sometimes known as the "cat's paw" theory. *See* <u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1332 (11th Cir. 1999). Plaintiffs' case proceeded upon the theory that Raymond Terbecki ("Terbecki"), Plaintiffs' manager, and Gloria Salerno ("Salerno), Director of Human Resources for Saks at the Bal Harbour store, both harbored age animus towards Plaintiffs, and that Terbecki and Salerno impermissibly influenced Phelan's decision to suspend and terminate Plaintiffs.

A.  Age Based Animus

1.  Age Based Animus by Terbecki

A reasonable juror could have found that Terbecki harbored age based animus towards Plaintiffs. Perez testified that Terbecki called her "harried," told her that "you look like my father," and stated that he was going to move her to the back room because she was "old." 9/22 Trial Tr. at 111, 115, 126. Plaintiffs also testified that they were denied professional opportunities by Terbecki, which were instead given to younger employees and that younger employees were

2

favored. *See* 9/22 Trial Tr. at 122-125, 201; 9/23 Trial Tr. at 42, 59. This evidence is sufficient to support a finding that Terbecki harbored age based animus.

>    2. Age Based Animus by Salerno

A reasonable juror could not have found that Salerno harbored age based animus towards Plaintiffs. Salerno worked for Saks at Bal Harbour from July of 2005 to April of 2006. 9/19 Trial. Tr. at 15. Terbecki testified that he and Salerno worked in conjunction when making hiring decisions in the Contemporary Department. 9/15 Trial Tr. at 104-05, 178. Terbecki also testified that during the time that both he and Salerno worked for Saks, 11 employees were hired into the Contemporary Department, all of whom were under the age of 40. 9/15 Trial Tr. at 188-22. No evidence was presented concerning the number of employees that applied for these positions or the ages of the applicants, given that the age of an applicant is unknown until the applicant is hired. The Contemporary Department had 12 to 15 employees, including Terbecki. 9/15 Trial Tr. at 103. The Saks store at Bal Harbour had approximately 250 employees. 9/19 Trial Tr. at 82. Salerno also participated in hiring employees for other departments. Id. at 32. From July of 2005 to April of 2006, 58 employees were hired at the Bal Harbour store, approximately one-third of whom were between the ages of 40 and 72. Id. at 130; Pl.s' Ex. 48. Salerno's assistants in Human Resources were both over the age of 40. 9/19 Trial Tr. at 129.

"Statistics can be an important source of proof in employment discrimination cases, since 'absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.'" Peightal v. Metro. Dade County, 26 F.3d 1545, 1553 (11th Cir. 1994) (quoting Hazelwood Sch. Dist. v. U.S., 433 U.S. 299, 307 (1977)). "'[S]tatistics . . . come in infinite variety . . . . [T]heir usefulness depends on all the surrounding facts and circumstances.'" Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 870 (11th

3

Cir. 1986) (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 311-12 (1977)).

Here, the hiring of 11 employees under the age of 40 into the Contemporary Department from July of 2005 to April of 2006 is, without more, insufficient to enable a reasonable juror to conclude that Salerno harbored age animus towards Plaintiffs. This hiring data, while not irrelevant, is simply too narrow in time, scope and substance to reasonably support a finding of age animus by Salerno. This is so because of: 1) the short time period during which the 11 Contemporary Department associates were hired; 2) the 12 to 15 employees in the Contemporary Department comprised only a small percentage of the Bar Harbour store's total employees; 3) approximately one-third of the employees hired during Salerno's tenure were over the age of 40; 4) Salerno was involved in hiring for the entire Bal Harbour store; 5) hiring in the Contemporary Department comprised less that twenty percent of total hiring during Salerno's tenure; 6) Salerno was not solely responsible for the recruiting and hiring of Contemporary Associates; and 7) the absence or unavailability of evidence concerning the number of applicants to the Contemporary Department during the relevant period. *See* 9/15 Trial Tr. at 103-05, 178. The fact that the Contemporary Department's first two hires after Plaintiffs were terminated were under the age of 40 adds nothing to the analysis. Salerno did not participate in their hiring and thus their hiring is not indicative of any age animus by Salerno.[1]  Accordingly, while the Contemporary Department's hiring data during Salerno's tenure is not wholly irrelevant, when viewed in the context of the Bal Harbour store's overall hiring data, no reasonable juror could rely on the hiring data to conclude that Salerno harbored age animus, either towards Plaintiffs or generally.

Plaintiffs also presented evidence that Deborah Slack ("Slack"), the Store Manager for

---

[1] After Plaintiffs were terminated, the next two hires in the Contemporary Department were Amber Hendrickson, hired April 25, 2006, and Lauren Massaro, hired June 6, 2006. Pl.s' Ex. 48. Sell area 24 in Plaintiffs' Exhibit 48 denotes the Contemporary Department. *See* 9/19 Trial Tr. at 36-37. Salerno left Saks in April of 2005 and testified that she likely did not assist with hiring employees who were hired on April 25, 2006. Id. at 33-34.

Saks at Bal Harbour, emailed Salerno stating that with respect to "[f]illing the St. John position assigned sales associate, younger is a priority." 9/19 Trial Tr. at 242-43. Slack testified that "younger" referenced attitude and not age. Id. at 243-44. The person hired to fill the St. John position, Rosalie Borg ("Borg"), was 71 years of age. Id. at 129-30. This statement could lead a reasonable juror to conclude that Slack was instructing Salerno to take age into account in hiring for the St. John position, which could itself support the inference that Slack could have considered age to be a priority with respect to other employment opportunities within the store. However, based on the fact that Borg, age 71, ultimately filled the position, Salerno either ignored Slack's instruction or did not understand Slack's comment concerning younger as a priority to have been made in reference to age. Therefore, Slack's comment to Salerno cannot reasonably support a finding of age based animus on the part of Salerno.

Plaintiffs testified that they attended a meeting which was also attended by Salerno, Terbecki and two other associates. 9/22 Trial Tr. at 131. Perez testified that during the meeting, which was convened to address issues occurring between associates on the floor of the Contemporary Department, Salerno became angry and yelled "don't you cross my door again." Id. at 132. However, Salerno's behavior and statements at this meeting do not constitute evidence of discriminatory bias because the sales associates in attendance were both over and under the age of 40. 9/15 Trial Tr. at 119, 154. Moreover, the reason for the meeting, and the subject of Salerno's comment, related to the operation of the Contemporary Department, and was unrelated to age or the issue of age discrimination. Therefore, no reasonable juror could conclude that Salerno's statement is evidence of age animus or retaliation because the statement had no connection with, and made no reference to, the age of any employee. Furthermore, Plaintiffs' claims that they were denied the opportunity to act as representatives of various clothing lines is not evidence of age based animus by Salerno because no evidence was presented that Salerno had

any responsibility over, or involvement with, the assignment of clothing lines to sales associates.

Perez reported Terbecki's comment that he was going to move her to the back room because of her age to Mindy Curtis ("Curtis") and Salerno in Human Resources, stating that it constituted age discrimination. 9/22 Trial Tr. at 119-21. Perez testified that Salerno did not agree that any age discrimination had occurred and that Perez was unaware of any action taken pursuant to her complaint against Terbecki. Id. at 120-21. However, Perez was never moved to the back room. Id. at 40. Perez also testified that she did not have any interactions with Salerno prior to that meeting. Id. at 116. Shortly thereafter, Salerno sent Curtis and Terbecki an email stating that they needed to discuss the fact that Perez "needs to be written up for leaving on Saturday and if she has not shown up on Sunday and today, then it would be considered job abandonment." 9/19 Trial Tr. at 41; Pl.s' Ex. 3. Terbecki responded stating that Perez had worked on Sunday. Id.

In light of the surrounding facts and circumstances concerning Salerno's disagreement with Perez that age discrimination had occurred, there is insufficient evidence for a reasonable juror to conclude that Salerno harbored age animus. The theory that Salerno harbored age based animus based on her failure to acknowledge to Perez that Terbecki acted in a discriminatory fashion is premised on the notion that it is always reasonable to conclude that inaction by a third party in response to an allegation of age discrimination constitutes age discrimination on the part of the third party to whom the claim is conveyed. While this might be true in some instances, the reasonableness of such a conclusion necessarily depends on surrounding facts and circumstances. Therefore, it is not inevitably true that in every case in which a human resources employee fails to acknowledge an allegation of age discrimination committed by a third party, such failure to acknowledge may always be reasonably attributed to age based animus.

Here, there was no prior relationship, adverse or otherwise, between Salerno and Perez that would suggest a likelihood of age animus by Salerno towards Perez. No evidence was

presented that Salerno had been indifferent to other claims of any form of discrimination by other Saks' employees in the past. Nor did the evidence indicate that Salerno and Terbecki had any type of special relationship that would have motivated Salerno to shield Terbecki from Perez's complaints or to adopt Terbecki's age animus. Salerno's failure to address Perez's complaints in a way that satisfied Perez does not constitute direct or meaningful circumstantial evidence that Salerno harbored age animus towards Perez. Nor does the evidence reasonably support the conclusion that Salerno was indifferent to Perez's claims because Salerno responded to Perez's claim by ensuring that Perez was not moved to the back room. 9/19 Trial Tr. at 39. Salerno also discussed the issue with Terbecki. Id. No evidence was presented that Leffler made a discrimination claim to Salerno or that Salerno was indifferent to such a claim.[2] Therefore, no reasonable juror could find that Salerno harbored age based animus towards Plaintiffs based on Salerno's response to Perez's claims of discrimination by Terbecki. To find otherwise would give rise to a de facto presumption of age based animus on the part of a human resources employee whenever the human resources employee fails to respond to an employee's discrimination claim, or to acknowledge the claim, in a way that satisfies the complainant.

Plaintiffs also went to great lengths at trial to prove that Plaintiffs received brand filtering or empowerment training in which they were taught that they had discretion to authorize discounts and that Saks had no written discount policy defining an unauthorized discount. While this may be evidence that Plaintiffs' were unfairly suspended and terminated, it is not evidence of age animus by Salerno or that Saks' stated reason for taking adverse employment action against Plaintiffs was merely pretextual. Even though Plaintiffs believed they were empowered to give

---

[2] Leffler testified that she complained to Human Resources that Terbecki had called her a shark, in reference to her aggressive sales tactics. 9/23 Trial Tr. at 42-45. However, no reasonable juror could conclude that this comment was related to, or based upon, age animus. Furthermore, Defendant's objections to Plaintiffs' attempts to elicit testimony concerning Leffler's comments to Noel Sugrue were sustained. Id. at 50-51.

7

discounts based on training they received at Saks, this does not support an inference of age animus by Salerno because there is no logical relationship between Plaintiffs' subjective belief as to the appropriateness of their conduct and Salerno's sentiment as to the respective ages of Plaintiffs. No evidence was presented that Salerno attended the brand filtering training, that she had any knowledge of information from the training related to discounts, or that she had general knowledge about the use of unauthorized discounts by other Contemporary Department associates. Nor does the empowerment training and lack of a definition for unauthorized discounts bear any relation to the likelihood that Salerno influenced Phelan's decision to terminate Plaintiffs. Therefore, the evidence concerning the empowerment training and Saks' discount policy bears primarily on the fairness of Plaintiffs' termination, an issue not before the jury at trial. Accordingly, evaluating the evidence in its entirety, no reasonable juror could conclude that Salerno harbored age animus towards Plaintiffs or that Plaintiffs' suspension and termination was retaliatory.

      B. "Cat's Paw" Theory

            1. Terbecki's Influence on Phelan's Decision to Suspend and Terminate Plaintiffs

Plaintiffs bore the burden of proving that Terbecki or Salerno influenced Phelan to take adverse employment action against Plaintiffs because of age based animus or retaliatory motives, such that Phelan was a mere conduit for the discriminatory bias or retaliatory motives of Terbecki or Salerno. However, Terbecki never had contact with Phelan concerning the Asset Protection Department's investigation of Plaintiffs or the suspension and termination of Plaintiffs. 9/16 Trial Tr. at 14-15. Nor did Terbecki participate in, or initiate, the Asset Protection's investigation. 9/16 Trial Tr. at 59-60; 9/17 Trial Tr. at 26. No evidence to the contrary was presented. Without having participated in the Asset Protection investigation and in the absence of any contact with Phelan, Terbecki could not have influenced Phelan's ultimate decision to terminate Plaintiffs or

8

skewed the results of the Asset Protection investigation to influence Phelan's decision.[3] There is no evidence in the record that Terbecki used any other means of influencing Phelan's decision to terminate Plaintiffs. Therefore, even though a reasonable juror could have concluded that Terbecki harbored age animus, no reasonable juror could have found that Terbecki influenced Phelan's decision such that Phelan became a mere conduit for Terbecki's discriminatory bias or retaliatory motives.

2. Salerno's Influence on Phelan's Decision to Suspend and Terminate Plaintiffs

Plaintiffs presented insufficient evidence at trial for a reasonable juror to conclude that Salerno harbored age animus. However, assuming, *arguendo*, that Salerno maintained discriminatory bias against Plaintiffs, there was insufficient evidence for a reasonable juror to conclude that Salerno influenced Phelan's decision to terminate Plaintiffs such that Phelan was a mere conduit for Salerno's age animus or retaliatory motives. On March 16, 2006, Terbecki sent Salerno an email notifying her that a sales associate had given him a receipt indicating that Leffler had given an unauthorized discount. 9/19 Trial Tr. at 61. Salerno responded to Terbecki by asking him to review other receipts to determine if Leffler had made other unauthorized discounts. Id. at 62; Pl.s' Ex. 16. Salerno notified Phelan of the receipt and told Phelan that she was in the process of determining how many times Leffler had given unauthorized discounts in the last month. 9/16 Trial Tr. at 154-55. Terbecki never investigated Plaintiffs' sales and refunds and did not provide Salerno with any other receipts. 9/19 Trial Tr. at 61-62. On March 21, 2006, Salerno sent Phelan an email stating that Salerno had a number of issues to discuss with her, including

---

[3] Plaintiffs' intimation that Terbecki initiated the Asset Protection investigation was unsupported by any evidence. *See* 9/22 Trial Tr. at 224. Plaintiffs are not entitled to inferences drawn in their favor based on testimony constituting unsupported speculation. *See* Lloyd v. Card, 283 Fed. Appx. 696, 701 (11th Cir. 2008) (stating that inferences based on speculation are not reasonable) (citing Marshall v. City of Cape Coral, Fla., 797 F.2d 1555, 1559 (11th Cir. 1986)). While evidence was presented that Terbecki initiated Salerno's investigation by providing her with a receipt, that investigation never yielded any results because Terbecki did not conduct the review of Plaintiffs' sales and refunds as Salerno requested.

Leffler's unauthorized discounts. Id. at 155-56; Pl.s' Ex. 17. Phelan responded that she did not have time to discuss the issues at that time but that they would speak the next day. Id. at 156. Neither party recalled the specifics of any conversation that occurred the following day concerning Leffler's discounts. Id. at 157; 9/19 Trial Tr. at 72.

On March 24, 2006, Jennifer Hanno ("Hanno"), Asset Protection Manager at the Bal Harbour Store, sent an email to Salerno notifying Salerno of the investigation Asset Protection had been conducting since December of 2005 concerning Plaintiffs' unauthorized discounts and refunds. 9/17 Trial Tr. at 23; Pl.s' Ex. 18. The email contained an attached spreadsheet providing the results of the investigation. Pl.s' Ex. 18. On March 25, 2006, Salerno sent an email to Phelan which included the spreadsheet and stated that "[a]s per our discussion yesterday, Lana Perez and Elena Leffler have been doing this together." Pl.s' Ex. 18. Salerno did not recall the specifics of the conversation referenced in the email. 9/17 Trial Tr. at 75. Plaintiffs were suspended on April 3, 2006. 9/16 Trial Tr. at 173-74. Phelen subsequently terminated Plaintiffs for giving unauthorized discounts and refunds. 9/16 Trial Tr. at 160, 163.

No reasonable juror could conclude, based on the evidence presented, that Salerno influenced Phelan's decision to terminate Plaintiffs such that Phelan became a mere conduit for Salerno's age animus or retaliatory motives. Although Salerno instructed Terbecki to review Plaintiffs' sales and refund activities, Terbecki never complied with Salerno's instruction. Therefore, Salerno was not privy to any information concerning Plaintiffs' sales and refund practices prior to receiving Hanno's March 24, 2006 email, except for the receipt she received from Terbecki. Moreover, Salerno's comment that "Lana Perez and Elena Leffler have been doing this together," which Salerno wrote when she forwarded Hanno's March 24th email and spreadsheet to Phelan, is insufficient to demonstrate that Salerno influenced Phelan's decision because it merely reiterated Hanno's findings. Pl.s' Ex. 18.

10

There is evidence that Salerno spoke with Phelan concerning Plaintiffs' sales and refund activities at least once between March 21 and March 24, 2006. 9/19 Trial Tr. at 155-57; Pl.s' Ex 18. However, again assuming that Salerno harbored age animus towards Plaintiffs, no evidence was presented about the nature of any discussion between Salerno and Phelan during that time period. Speculation concerning the substance of such a conversation, beyond its general subject matter, is therefore unwarranted. The mere fact that Salerno and Phelan discussed Plaintiffs' sales and refund activities is insufficient evidence upon which a juror could reasonably rely to conclude that Salerno availed herself of the opportunity to persuade Phelan to take adverse employment action against Plaintiffs because of discriminatory bias. Moreover, the evidence indicates that the conversation or conversations between Salerno and Phelan concerning Plaintiffs occurred between March 21 and March 24, 2006. Even if speculation concerning the substance of such conversations was warranted, it is unclear what information Salerno could have relied on to convince Phelan to take adverse employment action against Plaintiffs because Terbecki never conducted a review of Plaintiffs' sales and refunds and Salerno had not yet received notice of the Asset Protection investigation or its results. In the absence of evidence substantiating an attempt by Salerno to convince Phelan to take adverse employment action against Plaintiffs that relies on more than unsupported speculation, no reasonable juror could conclude that, in suspending and terminating Plaintiffs, Phelan acted as a mere conduit for Salerno's age based animus or retaliatory motives.

Furthermore, the evidence that the Asset Protection investigation was closed and subsequently reopened could not lead a reasonable juror to conclude that Salerno influenced Phelan's decision to suspend and terminate Plaintiffs. Hanno was unaware of Salerno's efforts in March of 2005 to review Plaintiffs' sales and refunds. 9/17 Trial Tr. at 72. Nonetheless, Asset Protection commenced its own investigation of Plaintiffs' sales and refunds in December of 2005.

The investigation was initiated based on a tip from Christine Ta, a sales associate in the Contemporary Department.[4]  9/17 Trial Tr. at 23.  This investigation continued until March of 2006.  On January 23, 2006, Megan Phillips ("Phillips"), a Saks corporate investigator, sent an email to Hanno concerning the investigation of Plaintiffs, stating that "if there is no activity or anything substantial to go on, let's close these investigations."  Id. at 51.  Phillips also made a notation in APIS, a system used by Asset Protection, indicating that she closed the investigation due to inactivity.  Id. at 68-69.  Hanno testified that Phillips was not involved with the investigation when the January 23, 2006, email was sent and that Phillips did not know the status of the investigation.  Id.  Hanno also testified that the investigation should not have been closed and was reopened shortly thereafter.  Id. at 69.

Plaintiffs presented no evidence that Terbecki or Salerno took any action to initiate the Asset Protection investigation in December of 2005 or that they were aware of the investigation prior to March of 2006.  No non-speculative evidence was presented that Phillips terminated the investigation of Plaintiffs because it had actually been concluded with no adverse findings.  Nor was any non-speculative evidence presented that Terbecki or Salerno played a role in reopening the Asset Protection investigation.  Therefore, the fact that the Asset Protection investigation was closed and later reopened is not evidence that Salerno influenced Phelan to take adverse employment action against Plaintiffs.

Furthermore, the fact that Phelan did not conduct another independent investigation after

---

[4] Alex Freixa ("Freixa"), the Saks Asset Protection Supervisor, testified that the investigation into Plaintiffs' sales and refund practices was initiated because of excessive discounts that appeared in regular daily reports produced by Asset Protection.  9/23 Trial Tr. at 229-31.  There is therefore some inconsistency between the testimony of Hanno and Freixa as to whether the investigation of Plaintiffs was initiated by a tip from a sales associate or by anomalies that appeared on certain daily reports.  However, this inconsistency is not evidence that Terbecki or Salerno was actually responsible for initiating the Asset Protection investigation.  Such a conclusion is unreasonable because it would require unsupported speculation and is therefore an inference to which Plaintiffs are not entitled.  See Lloyd v. Card, 283 Fed. Appx. 696, 701 (11th Cir. 2008) (stating that inferences based on speculation are not reasonable) (citing Marshall v. City of Cape Coral, Fla., 797 F.2d 1555, 1559 (11th Cir. 1986))

receiving the results of the Asset Protection investigation from Hanno is of no moment because there is no non-speculative evidence that Phelan relied on anything other than Hanno's investigation results and its fruits in reaching her decision to suspend and terminate Plaintiffs.[5] *See* 9/16 Trial Tr. at 159. Nor is there any evidence that the Asset Protection investigation was tainted by age animus. Therefore, Phelan relied on the results of an independent investigation and no additional investigation by Phelan was necessary to dispel suspicion of discriminatory bias.

Nor is it significant that Salerno did not advise Phelan of all information related to Plaintiffs' employment history at Saks, particularly information inapposite to Plaintiffs' sales and refund practices. That Salerno did not apprise Phelan of Plaintiffs' entire employment history at Saks, including prior claims of discrimination against a third party, provides no reasonable basis for concluding that Salerno withheld information from Phelan due to age animus. This is because no evidence was presented that Salerno failed to disclose information that could reasonably have been expected to alter Phelan's decision. Even if Phelan had known that Perez had complained of age discrimination by Terbecki, there is no rationale that suggests how this information might have altered Phelan's decision or how Salerno could have benefitted by not disclosing it, especially because Perez's discrimination claim was against Terbecki, not Salerno.

Plaintiffs' evidence of disparate treatment between Plaintiffs and David Algarin ("Algarin") does not support their claims of discrimination and retaliation. In a case alleging age animus by a decision maker, disparate treatment of a comparator is relevant because it gives rise to the inference that the stated reason for taking the adverse employment action was pretextual. *See* Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). In a "cat's paw" case, an inference of pretext from disparate treatment only arises if a non-decision maker

---

[5] The Asset Protection investigation led to the notes of Hanno's interviews with Plaintiffs and the resulting written statements. Pl.s' Exs. 67, 68; Def.'s Exs. 21, 41.

harboring age animus influenced the decision maker to take adverse employment action against a Plaintiff while taking less severe or no adverse employment action against the comparator. However, without other evidence that a non-decision maker influenced the decision maker's adverse employment action, no inference of pretext is warranted. When no animus is alleged on the part of the decision maker, the absence of evidence of influence by the non-decision maker on the decision maker's adverse employment action makes it impossible for disparate treatment to serve as independent evidence of age animus by the non-decision maker because there is no nexus between the disparate treatment and the non-decision maker accused of discriminatory bias. Likewise, evidence of disparate treatment cannot itself serve as evidence that the decision maker was influenced by a non-decision maker with discriminatory bias. While disparate treatment may suggest animus on the part of a decision maker, it does not inherently suggest that a neutral decision maker must have been influenced by a third party. Therefore, in a "cat's paw" case, disparate treatment cannot serve as evidence that a non-decision maker harbored discriminatory bias or that the decision maker acted as a conduit for the non-decision maker's age animus, absent other evidence suggesting that the disparate treatment was influenced by a non-decision maker.

For disparate treatment of Algarin to be relevant here, Plaintiffs must have presented other evidence that Terbecki or Salerno influenced Phelan to take adverse employment action against Plaintiffs, such that Phelan became a conduit for Terbecki or Salerno's discriminatory bias or retaliatory motives. Plaintiffs presented insufficient evidence for a reasonable juror to conclude that Phelan acted as a conduit for Salerno's age animus or retaliatory motives or that Salerno harbored age animus towards Plaintiffs. Furthermore, no evidence was presented that Terbecki influenced Phelan's decision to terminate Plaintiffs in such a way that Phelen was merely the "cat's paw" for Terbecki's discriminatory bias or retaliatory motives. Therefore, Plaintiffs evidence of disparate treatment does not support their claims of "cat's paw" liability.

14

Taking the evidence as a whole and viewing it in its aggregate, a reasonable juror could conclude that Terbecki harbored age animus towards Plaintiffs. However, no reasonable juror could rely on the accumulation of all evidence presented at trial to conclude that Salerno harbored age animus towards Plaintiffs or maintained age based discriminatory bias in general. Furthermore, no reasonable juror could conclude that in taking adverse employment action against Plaintiffs, Phelan acted as a mere conduct for Terbecki or Salerno's age animus or retaliatory motives.

## III.   CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant's Motion for Judgment as a Matter of Law (dkt # 179) is GRANTED. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this _5th_ day of January, 2009.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record